UNDERSEAL

FILED
2016 JUN -9 P 3: 43
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NO. DIST. OF CA

GREGORY J. BROD, CSB 184456
gregb@brodfirm.com
**BROD LAW FIRM, P.C.**
96 Jessie Street
San Francisco, California 94105
Telephone (415) 397-1130
Facsimile (415) 397-2121

Attorneys for Relator

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SK

**CV16      3162**

| | |
|---|---|
| **UNITED STATES OF AMERCIA,** ex rel. **[UNDER SEAL]**, <br><br> Plaintiffs, <br><br> vs. <br><br> **[UNDER SEAL]**, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT AND ANTI-KICKBACK STATUTE** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **JURY TRIAL DEMANDED** |

COMPLAINT

GREGORY J. BROD, CSB 184456
gregb@brodfirm.com
**BROD LAW FIRM, P.C.**
96 Jessie Street
San Francisco, California 94105
Telephone (415) 397-1130
Facsimile (415) 397-2121

Attorneys for Relator

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERCIA,** ex rel. **STEVEN KURT,**<br><br>         Plaintiffs,<br><br>vs.<br><br>**MEDICS CHOICE HOME HEALTH, INC., FELINA GIRON ROQUE, and DOES 1 to 100,**<br><br>         Defendants. | Case No. _____<br><br>**COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT AND ANTI-KICKBACK STATUTE**<br><br>┌─────────────────────────┐<br>│ **FILED UNDER SEAL PURSUANT TO** │<br>│ **31 U.S.C. § 3730(b)(2)** │<br>└─────────────────────────┘<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

## **TABLE OF CONTENTS**

I.  INTRODUCTION/STATEMENT OF FACTS.............................................................1

II.  JURISDICTION AND VENUE......................................................................2

III.  PARTIES.................................................................................2

IV.  BACKGROUND...............................................................................3

    A. The United States Medicare System .......................................................3

    B. Medicare Home Health Services .........................................................5

    C.  Laws, Policies and Guidelines in Home Health...........................................6

V.  DEFENDANTS' SCHEME.........................................................................7

    A.   Defendants Provided Home Health Services for Patients Who Were Not Homebound and Did Not Need Those Services .................................................7

    B.   Defendants Falsified Medical Records in order to bill Medicare for Unnecessary Services and Services that Were Never Provided ..............................................8

    C.   Defendants Provided Illegal Kickbacks in Exchange for Patient Referrals......................................................................................9

VI.  CAUSES OF ACTION.........................................................................10

    FIRST CAUSE OF ACTION  - FEDERAL FALSE CLAIMS ACT, PRESENTING FALSE CLAIMS - 31 U.S.C. § 3729(a)(1)(A)...................................................10

    SECOND CAUSE OF ACTION  - FEDERAL FALSE CLAIMS ACT, MAKING OR USING FLASE RECORDS OR STATEMENTS MATERIAL TO PAYMENT OR APPROVAL OF FALSE CLAIMS - 31 U.S.C. §3729(a)(1)(B)...........................11

    THIRD CAUSE OF ACTION  - FEDERAL FALSE CLAIMS ACT, RETENTION OF PROCEEDS OF INADVERTENTLY SUBMITTED FALSE CLAIMS - 31 U.S.C. § 3729(a)(1)(G)............................................................................12

    FOURTH CAUSE OF ACTION  - VIOLATION OF ANTI-KICKBACK STATUTE - 42 U.S.C. § 1320a-7b.....................................................................12

VII.    PRAYER FOR RELIEF……………………….……………………….……..…...14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

Plaintiff UNITED STATES OF AMERICA ("UNITED STATES") by and through *Qui Tam* Plaintiff ("Relator") STEVEN KURT, alleges as follows:

## I.    **INTRODUCTION**

1.    This case is brought to stop Medicare fraud carried out by MEDICS CHOICE HOME HEALTH, INC. (hereinafter referred to as "MEDICS CHOICE") and its owners. MEDICS CHOICE has engaged in a scheme designed to increase profits at the direct expense of Medicare, which scheme is so rampant, it as at the core of defendants' very business model.

2.    Defendants knowingly submitted false and fraudulent claims through the following schemes: 1) Providing unnecessary home health services for patients who are not home bound; 2) falsifying medical records in order to bill Medicare for unnecessary services and services that were never rendered; and 3) providing cash payments for patient referrals in violation of federal Anti-Kickback laws.

3.    Defendants actively instructed the employees of MEDICS CHOICE to "correct" or alter medical records to ensure that the maximum payment was billed to Medicare and retained by Defendants.  Said payments would not have been permitted had Defendants' records not been falsified.

4.    If defendants' employees discovered proof that a given patient was determined not to be home-bound, and therefore unable to qualify for defendants' services under Medicare, the employee was instructed to ignore or destroy the evidence of the patient's lack of qualification for the services.

5.     For example, on April 23, 2015, nurse Teri Iqbal was asked by her supervisor to provide home health services to a patient who had no idea a doctor had apparently ordered home health services.

6.     As another example, in August 2015, a MEDICS CHOICE nurse noted that a patient was not homebound, and therefore not eligible for the services that were billed to Medicare.  Rather than refund Medicare, management at MEDICS CHOICE intended to delete this note, but could not, and advised nurses and staff to cease from including notes that provided documentation that MEDICS CHOICE's services were unnecessary.

7.     As a result of defendants' submission of false claims to Medicare, the UNITED STATES has suffered damages well in excess of $2,000,000.00.  Between September, 2014 and October, 2015, MEDICS CHOICE received approximately $2,900,000.00 from Medicare, much of which was based upon fraudulent claims.

## II.     JURISDICTION AND VENUE

8.     This Court has jurisdiction over the claims raised in this complaint under 31 U.S.C. § 3730(b) and 3732(a), which confer jurisdiction on this Court for actions brought under the federal False Claims Act and authorize nationwide service of process.

9.     Venue is proper under 31 U.S.C. § 3732(a), as Defendant MEDICS CHOICE transacts business within the Northern District of California.

## III.    PARTIES

10.    The Plaintiff in this action is the UNITED STATES OF AMERICA, by and through *Qui Tam* Plaintiff (*i.e.,* Relator) STEVEN KURT.

11.     Relator STEVEN KURT is a medical biller who resides in Redwood City, California.  Mr. KURT holds a Masters in Business Administration and Bachelors Degree in chemical engineering, and has been a medical biller for approximately three years.  Mr. KURT was employed as the Medical Biller at MEDICS CHOICE HOME HEALTH, INC. from February, 2015 to October, 2015 in Milpitas, California.

12.     Defendant MEDICS CHOICE is a California corporation, with a registered address as 1609A S. Main Street, Milpitas, California 95035.  It was incorporated in 2012, and Defendant FELINA GIRON ROQUE is its registered agent for process.  MEDICS CHOICE's principal place of business is 1609A S. Main Street, Milpitas, California 95035.

13.     MEDICS CHOICE is a Medicare-certified Home Health Agency ("HHA") that has been entrusted by Medicare to provide necessary home health services to patients who qualify for those services.

14.     Defendant FELINA GIRON ROQUE is the owner, CEO and President of MEDICS CHOICE, and a resident of Santa Clara County, California.  Defendant ROQUE is a licensed registered nurse who, at all pertinent times, had knowledge of, and participated in, the fraudulent activities described herein.

## IV.   **BACKGROUND**

### A.   **The United States Medicare System**

15.     Medicare is a federally-funded health care program that provides medical insurance coverage to qualified residents of the United States who are aged 65 and older, younger people with permanent or congenital disabilities, or those who meet other special criteria like the End Stage Renal Disease program.  The vast majority of Medicare's costs are

paid by United States citizens through their taxes.  In addition to paying for medical expenses such as doctor visits and hospital stays, Medicare pays for home medical devices and supplies for eligible Medicare recipients.

16.     Title XVII of the Social Security Act establishes the Medicare Program (technically, the "Health Insurance for the Aged and Disabled Program").  *See* 42 U.S.C. §§ 1397 *et seq.*

17.     The United States provides reimbursement for Medicare claims from the Medicare Trust Funds through the Centers for Medicare & Medicaid Services ("CMS"), which is the operating division of the United States Department of Health & Human Services ("HHS").  CMS, in turn, contracts out to Medicare Administrative Contractors ("MACs") to review, approve, and pay Medicare claims received from health care providers.

18.     Payments are typically made directly to health care providers rather than the patient, as Medicare recipients routinely assign their right to payment to the health care provider.  Once a Medicare recipient assigns their right to payment to a provider, the provider then submits its bill directly to Medicare for payment.

19.     To bill Medicare, a provider must submit an electronic or hard-copy claim form called a CMS-1500 form.  When submitting the form, the provider must certify that the treatment was "medically indicated and necessary for the health of the patient."

20.     All healthcare providers must comply with all applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare.  Providers have a duty to have knowledge of the relevant statutes, regulations, and guidelines regarding coverage for Medicare services.  For example, Medicare reimburses only reasonable and necessary medical services furnished to

beneficiaries and excludes from payment services that are not reasonable and necessary. *See* 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 C.F.R. § 411.115(k). Providers must also assure that they provide medical services to Medicare recipients "economically and only when, and to the extent, medically necessary." 42 U.S.C. §1320c-5(a)(1).

21.    Because it is not realistically feasible to review medical documentation before paying each claim, payment under Medicare is generally based on the providers' certification on the Medicare claim form that the services in question were "medically indicated and necessary for the health of the patient."

**B.    Medicare Home Health Services**

22.    In order to qualify for Medicare Home Health Services, a patient must need the assistance of another person to leave their home, or a physician must believe that leaving the home would be harmful to the patient's health. To verify this qualification, a physician must sign a home health certification, stating that the patient is homebound and needs intermittent skilled care. The certification must state that a plan of care has been made for the patient, and a physician must regularly review the plan of care. The certification must also state that a face-to-face meeting with the patient has taken place regarding the main reason for the homebound care within 90 days of starting to receive home health care, or within 30 days of receiving the care.

23.    Defendant MEDICS CHOICE, a Home Health Agency ("HHA"), advertises its in-home health care services to include: Skilled Nursing, Home Health Aide, and Medical Social Services, as well as Physical Therapy, Speech Therapy, Occupational Therapy and Nutritional Consultation.

24.     Under their scheme, in many instances, Defendants begin providing services and billing for those services, before they have been determined to be necessary by anyone.

25.     For some patients, Defendants presented physicians with multiple home health certifications to sign "in bulk" without the patient ever having been seen by that, or any doctor. In other instances, Defendants' staff were instructed to forge physicians' signatures, which would be scanned into the electronic medical records system.  The certifications would be backdated to state that the certification was made prior to, or on the same date the initial services were provided.

C.      **Laws, Policies & Guidelines in Home Health**

26.     In the context of home health services, Medicare utilizes a system entitled the Outcome and Assessment Information Set ("OASIS") to allow for the transmission of data from HHA's.  The submission of data regarding a patient's course of treatment via OASIS is essential to Medicare.

27.     Chapter 10 of Medicare's Claims Processing Manual, which addresses Home Health Agency Billing, allows an HHA to submit a Request for Anticipated Payment ("RAP"). A RAP may be submitted only when all four of the following criteria are met:

1.      After the OASIS assessment is complete;

2.      Once a physician's verbal orders for home care are received and documented;

3.      After a plan of care has been established and sent to the physician; and

4.      The first service visit under the plan has been delivered.

28.     If an HHA provides at least five home visits to the patient during a 60-day

period, referred to as an "episode", the HHA will be entitled to the remaining full payment for that episode. Typically, an HHA can bill Medicare from between $2,900 per episode for nurse visits, and up to $5,000 per episode if the visits include a mixed of services, including nursing and physical therapy.

29.   If the HHA provides four visits or less in an episode, the HHA will be paid less money that it would ordinarily be entitled to. Instead, the HHA would be paid on a per visit basis, instead of per episode, which is approximately $160 per visit. That payment adjustment for failing to provide at least five visits within an episode is called a Low Utilization Payment Adjustment "(LUPA"). A LUPA results in Medicare taking RAP funds back from the HHA, and the loss of thousands of dollars per patient episode.

## V.   DEFENDANT'S SCHEME

### A.   Defendants Provided Home Health Services for Patients Who Were Not Homebound and Did Not Need Those Services

30.   For a majority of its patients, Defendant MEDICS CHOICE submits a RAP to Medicare for advance payment on the patient's plan of care.

31.   To avoid the LUPA payment adjustment, and to ensure they receive the full payment for each episode, Defendants provided unnecessary visits to patients who were not qualified as "home bound", and therefore MEDICS CHOICE's services were not medically necessary for the health of the patient.

32.   Under their scheme, in many instances, Defendants engage in up coding and begin providing home health services, and billing for those services, before anyone has claimed that the services are necessary.

33.     In some instances, Defendants forged physicians' signatures in order to submit RAP requests for payment to Medicare, and Defendants' staff was ordered to shred the hard copy of these forged physicians' signatures.

34.     In other instances, Defendants presented certain physicians with multiple home health certifications to be signed in bulk, without those patients having been seen by anyone.

35.     Defendants employed a practice whereby patients' home health certifications were backdated to state that the certification was made prior to, or on the same date the initial services were provided.

36.     Defendants, therefore, have submitted payment requests to Medicare on behalf of patients who were not seen by the doctors whose signatures appear on the home health certifications, as well as many payment requests where the doctor whose name appears on the certification is completely unaware of it.

37.     Despite operating a business that exclusively provides home health services, most, if not all of Defendants "patients" are simply not "homebound", at all.  In addition to illegally certifying patients for in-home health care services without the requisite physician's orders, Defendants also re-certified patients who were not homebound, simply to continue with their billing scheme.

        B.   Defendants Falsified Medical Records in order to bill Medicare for Unnecessary
        Services and Services that Were Never Provided

38.     To avoid the LUPA payment adjustment, and to ensure they receive the full payment for each episode, in many instances, Defendants simply adjusted and "corrected" their

records to change dates of services, or to "fix" and/or "complete" the patients' charts by adding

home visits that never occurred.

39.     Defendants falsified medical certifications to conform with the dates that initial

treatment was provided to patients, and forged physicians' signatures to create bogus

certifications.  In addition, in instances where the patient had not received the requisite number

of visits to ensure payment from Medicare, defendants simply falsified records to state that

services were rendered, when they were not.

40.     For example, in October of 2015, Taj Mahal Dela Cruz was instructed to make

"adjustments with the visit dates made by HHA in order to have these visits within the

certification period."

41.     The practice of falsifying records in order to ensure payment and avoid LUPA

charges and refunds was rampant and essential to Defendants' scheme, in which Medicare's

requirements for payment were simply disregarded.

C.  Defendants Provided Illegal Kickbacks in Exchange for Patient Referrals

42.     Defendants actively solicited patients, including residents of assisted living

facilities, to provide unnecessary services, in furtherance of their schemes.

43.     Though most of the patients that were the subject of Defendants' scheme did not

need, and therefore could not qualify for home health services under Medicare, Defendants paid

cash bonuses in the amount of $200.00 per patient at certain assisted living facilities in exchange

for defendants "signing up" multiple patients.

44.     In addition to making cash payments for patient referrals in violation of the

federal Anti-Kickback statute, Defendant FELINA GIRON ROQUE is an owner of at least one

"elderly care facility", where defendants provide home medical services to their own tenants, who are also not medically homebound.

## VI.   CAUSES OF ACTION

45.    At all times relevant hereto, Defendants "knew" or acted "knowingly," as those terms are defined in the federal False Claims Acts, in making, presenting, or submitting false claims.  In that respect, Defendants acted:

(a)    With actual knowledge of the information; or

(b)    In deliberate ignorance of the truth or falsity of the information; or

(c)    With reckless disregard of the truth or falsity of the information.

46.    As a result of the foregoing, each claim for payment made by MEDICS CHOICE to Medicare for payments, including but not limited to RAP payments and final payments for a patient's episode, constitutes a false claim in violation of federal False Claims Act.

### FIRST CAUSE OF ACTION
### FEDERAL FALSE CLAIMS ACT, PRESENTING FALSE CLAIMS
### 31 U.S.C. § 3729(a)(1)(A)

47.    *Qui Tam* Plaintiff incorporates herein by reference and realleges the allegations stated in Paragraphs 1 through 46, inclusive, of this Complaint.

48.    Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false claims for payment or approval to an officer or employee of the United States.

49.    Defendants knowingly caused to be presented false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of

services, in order to obtain payment or approval of charges by the Medicare program for home health services that were not needed and medically unnecessary.

50.     Defendants altered documents, dates of service and even forged signatures and fabricated services, all in order to retain payments made by Medicare, and in furtherance of their scheme to submit false claims to Medicare.

51.     Defendants knew or should have known that many of their patients were not home bound, and therefore could not qualify for Medicare's home health services, yet Defendants sought every opportunity to improperly bill, and to continue to bill Medicare.

52.     Defendants knowingly made, used, and caused to be made and used false certifications that claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

53.     The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## SECOND CAUSE OF ACTION
### FEDERAL FALSE CLAIMS ACT, MAKING OR USING FALSE RECORDS OR STATEMENTS MATERIAL TO PAYMENT OR APPROVAL OF FALSE CLAIMS
### 31 U.S.C. § 3729(a)(1)(B)

54.     *Qui Tam* Plaintiff incorporates herein by reference and realleges the allegations stated in Paragraphs 1 through 53, inclusive, of this Complaint.

55.     Defendant knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

56.     Defendants altered documents, dates of service and even forged signatures and fabricated services, all in order to retain payments made by Medicare, and in furtherance of their scheme to fraudulently bill Medicare.

57.     Defendants knew or should have known that many of their patients were not home bound, and therefore could not qualify for Medicare's home health services, yet Defendants sought every opportunity to improperly bill, and to continue to bill Medicare.

58.     Defendants knowingly made, used, and caused to be made and used false certifications that claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

59.     The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

### THIRD CAUSE OF ACTION
**(In the Alternative)**
**FEDERAL FALSE CLAIMS ACT, RETENTION OF PROCEEDS**
**OF INADVERTENTLY SUBMITTED FALSE CLAIMS**
**31 U.S.C. § 3729(a)(1)(G)**

60.     *Qui Tam* Plaintiff incorporates herein by reference and realleges the allegations stated in paragraphs 1 through 59, inclusive, of this Complaint.

61.     In the alternative, Defendants knowingly concealed or knowingly and improperly avoided or decreased its obligation to pay or transmit money or property to the United States.

62.     Specifically, Defendants charged Medicare for home health services that were medically unnecessary and in many instances, not ordered by a physician.

63.     When Defendants learned of specific patients who were clearly not home bound, and therefore had no basis for receiving MEDICS CHOICE's services, Defendants chose to alter records and retain Medicare's funds.

64.     The conduct of Defendants violated 31 § 3729(a)(1)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## FOURTH CAUSE OF ACTION
### VIOLATION OF ANTI-KICKBACK STATUTE
### 42 U.S.C. § 1320a-7b

65.     *Qui Tam* Plaintiff incorporates herein by reference and realleges the allegations stated in paragraphs 1 through 64, inclusive, of this Complaint.

66.     42 U.S.C. § 1320a-7b, known as the "Anti-Kickback Statute", prohibits offering, paying, soliciting or receiving anything of value to induce or reward referrals for federal health care program business.

67.     As part of the scheme as described herein, Defendant MEDICS CHOICE actively solicited facilities, including but not limited to assisted living facilities and other locations where elderly people reside, to "sign up" patients who would then receive Defendants' home health services.

68.     As an essential part of Defendants' scheme, MEDICS CHOICE offered and paid approximately $200.00 in cash per patient referral to MEDICS CHOICE.

69.     In addition to actively seeking patient referrals in exchange for cash payments, Defendant FELINA ROQUE referred residents of homes in which ROQUE was an owner, to MEDICS CHOICE to receive home health services.

70.     By virtue of her ownership in both MEDICS CHOICE, as well as homes in which she referred her residents to MEDICS CHOICE for home health services, ROQUE both solicited and received value for all of these referrals, many, if not all of whom, were not qualified for home health services.

71.     The conduct of Defendants violated 42 § 1320a-7b and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## VII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, by and through the Relator, prays judgment in its favor and against Defendants as follows:

1.      That judgment be entered in favor of Plaintiff UNITED STATES OF AMERICA, *ex rel.* STEVEN KURT, and against Defendants MEDICS CHOICE HOME HEALTH, INC. and FELINA GIRON ROQUE according to proof, as follows:

    a.      On all Federal Causes of Action, damages as provided by 31 U.S.C. § 3729(a)(1), in the amount of:

        i.      Triple the amount of damages sustained by the United States;

        ii.     Civil penalties of Eleven Thousand Dollars ($11,000) for each false claim;

        iii.    Recovery of costs, attorneys' fees, and expenses;

        iv.     Pre- and post-judgment interest;

        v.      Such other and further relief as the Court deems just and proper;

2.      Further, *Qui Tam* Plaintiff, on his own behalf, requests that he receive such maximum amount as permitted by law, of the proceeds of this action or settlement

of this action collected by the United States, plus an amount for reasonable

expenses incurred, plus reasonable attorneys' fees and costs of this action.  *Qui*

*Tam* Plaintiff requests that their percentage be based upon the total value

recovered, including any amounts received from individuals or entities not parties

to this action.

Dated:  June ___, 2016            **BROD LAW FIRM, P.C.**

By: _____
                 GREGORY J. BROD

*Attorneys for Relator*

COMPLAINT
- 15